We'll go on to case number three, Appeal 14-2808 Brown v. Blanchard in Woolworth County, Wisconsin. Based on well-settled Supreme Court precedent, it is undisputed in this case that the seizure of John Brown did not occur until the moment the Deputy Blanchard fired his weapon and shot Mr. Brown. We are on appeal today, at least in part, because the District Court did not limit its use-of-force analysis to just that moment. Instead, the District Court ignored this Court's precedent in Carter v. Buescher and concluded that Deputy Blanchard could still face Fourth Amendment liability for his pre-seizure conduct. Based on this Court's ruling in Carter, which was reiterated again in Plakas and in 2009 in Marion, at minimum, Deputy Blanchard should be afforded qualified immunity for his pre-seizure conduct. Turning to the shooting itself Do you really think the pre-seizure conduct thing is crucial to this? I mean, it sounded like to me that Judge Adelman said, okay, there's two different theories here. That's one of the theories, but on the other theory there's a dispute about the, for want of a better word, triggering events that triggered the whole incident. I think Your Honor's correct. There's two issues that are really before the Court. The first is the issue of pre-seizure conduct, and the second is the actual seizure itself and the underlying basis for that. And on that front, despite ruling against Deputy Blanchard, Judge Adelman acknowledged a few very important points. First, Judge Adelman acknowledged that the primary question for the actual use of force was whether or not Mr. Brown advanced towards the officers, put the knife in an upward direction, and was within five or six feet of the officers. Second, Judge Adelman recognized that both affidavits from both Deputy Such and Deputy Blanchard concretely established that that was the case. That's what they observed. And then the Court went further and noted that Ms. Brown, on behalf of the estate, could not present any other evidence to dispute that. Well, she didn't see what happened, but she heard the encounter, and her testimony differs as to the sequence of events at the critical times. Specifically, after the second time the door was kicked in, she didn't hear Blanchard tell Brown to drop the knife, and she didn't hear Brown state that they would have to shoot him. So my question is, isn't that a significant contradiction that creates a material issue of fact as to what happened? And why wouldn't that alone be a sufficient basis to uphold a denial of summary judgment here? Your Honor, you're correct in that there are, in this entire case, there are two issues of fact, and you've identified both of them. First, Ms. Brown has indicated that she didn't hear Deputy Blanchard yell, drop the knife, and Ms. Brown also disputes the timing of when Mr. Brown said, you're going to have to shoot me in the head or shoot me between the eyes. Ms. Brown, who didn't see the door open or close, is of the belief that Mr. Brown said that when the door was closed. Deputy Blanchard's affidavit indicates that Mr. Brown really said it when the door was open. Both of those are completely immaterial facts to what happened. The only material facts in this case that justify the use of deadly force is that Mr. Brown was six feet away from the officers, advanced towards the officers, and moved the knife in an upward direction. But if there's some reason, I mean, are you saying that unless there was some other eyewitness who saw it and contradicted it, there's no way of creating a genuine issue of fact? Absolutely not, Your Honor. In these deadly force cases, I understand- There's usually no other witnesses other than the police officers. That's exactly right. But, you know, summary judgment is still denied sometimes, and the reason it's denied is because there's scientific evidence. There's physical evidence at the scene. Not always. Not always, though. I mean, it's no different from any other summary judgment case. If you introduce evidence that gives a sufficient reason to doubt the person's credibility, it's not just enough to say, I don't believe him, but if you introduce some other evidence that gives you a sufficient reason to doubt their credibility, then there's an issue of fact. That was- I mean, when we tell juries, it's one of the pattern jury instructions, that if somebody's impeached, you can believe all of what they say, or some of what they say, or none of what they say. That was specifically rejected in Muhammad v. The City of Chicago, which the district court even cited. These are immaterial, factual disputes. One of them is so minor in terms of, they both agree that Mr. Brown said, you're going to have to shoot me in the head, but they just don't agree on the exact timing of when it occurred. And the issue of, you know, drop the knife, this isn't- I'm reminded of going back to the Placid case. But if he didn't say drop the knife, in other words, if there's a dispute about whether he said drop the knife, an inference from that could be, he wasn't holding a knife. And that's pretty critical to the officer's position in the case, that he was advancing on them holding a knife, right? I don't think that's- Yes, you're right. But I don't think that's a reasonable inference from, if the officer did not order him to drop the knife. If we were to assume that to be a fact- But if the officer says, I told him to drop the knife, and somebody else who was there says, I didn't hear that, in other words, it wasn't said, couldn't somebody infer from that the guy wasn't holding the knife? No. That would not be a reasonable inference. Okay. First of all, the fact that a witness didn't hear something does not establish that it wasn't said. How far away was she? She was down a long corridor. How long is long? Farther from the New York- It's further than the two of us, but this is less than a thousand square foot trailer. It's a trailer. It's a trailer. Sure. But there was undisputedly loud music being played from inside Mr. Brown's bedroom. The officers heard it. Miss Brown heard it. And this was a hectic scene. Miss Brown was undeniably under significant amount of stress. And again, Your Honor, we've relied on the Placas decision, which as I reviewed that case again, I found very interesting the fact that the court, right at the beginning of the case, acknowledged that there were some disputes of fact. They were minor. But one of them, maybe not so minor. The officer testified that as he was backing up, as he was being approached by the suspect with the fire poker, he backed up and was backed into a tree. And that that was what compelled his need to use deadly force because he couldn't back up any further. Well, as the court went through it, the court evaluated that there was no footprints by this alleged tree. And in fact, there was no tree at all. There was a sapling that probably couldn't have stopped the officer. So we don't deny summary judgment just on the basis of there being some factual differences. It has to be a material fact that would make an outcome and change the outcome of the case. And in this case, no reasonable jury could conclude that the use of deadly force was improper as long as the core undisputed facts remain the same. Mr. Brown was armed with a knife. He was five to six feet from the officers. He advanced on the officers and he moved the knife in an upward direction. With those core undisputed facts, no reasonable jury that's not relying on speculation or rule against Deputy Blanchard. You argued in the brief that pre-seizure conduct cannot form the basis for a Fourth Amendment claim. But should we even characterize the conduct in kicking in the door and confronting him to be pre-seizure conduct? Or is that conduct in the course of seizing him? I think under the Supreme Court's precedent in California v. Houdari and subsequent precedent, it's clear that the seizure itself does not occur until either the person acquiesces to some show of authority or the police have actual physical contact with the suspect. And here, it's undeniable that, number one, Mr. Brown did not positively acknowledge the officers. He didn't show any consent to their authority. He yelled profanities at them through the door. Second of all, the officers certainly never touched Mr. Brown until the shooting occurred. So I don't think the seizure occurred until the moment that the shots were fired. And the other thing is that the door was kicked in twice. Pointing the gun isn't enough? Pointing the gun isn't enough for a seizure? If that's the case, pointing the gun occurred after kicking the door in. How long after kicking? They didn't kick the door without their guns pointed, right? Somebody had a gun pointed while the other one kicked the door. That's not correct. Deputy Blanchard had his gun drawn, and Deputy Blanchard was the one who kicked the door in on both occasions. But he had his gun drawn? Sure. His gun was drawn. So how long before pointing the gun at the person did he kick the door down? A second or two? Your Honor, I think that's probably accurate. It may have happened quicker. Blanchard arrives on the scene, and the shooting is two minutes later. Yes. So, in terms of defining the seizure, I think, I would not agree that in all circumstances pointing a gun at an individual automatically constitutes a seizure. In many cases, it does. But it still requires some action on the part of the suspect. When is it not a seizure when a gun is in your face? When a suspect isn't showing any signs of submitting to the authority, to the police officers, or isn't stopping. And that's what happened here, Your Honor. The door was kicked in the first time, Mr. Brown stood up. Those cases about not stopping, though, are situations where the police officer says stop and the person doesn't stop. The cases about, I'm pointing a gun at you, and it's not a seizure even if you're still moving? Are there really cases that say that? Not that I'm aware of, but the cases that govern seizures, on the whole, stand for the proposition that, number one, the individual has to show some sort of sign of stopping or submitting to the authority of officers, or there has to be some sort of physical contact. And again, in this case, and even the estate doesn't argue, the seizure of Mr. Brown did not occur until the moment that he was shot. So this whole thing about pre-seizure conduct, doesn't Deering v. Reich say that the jury can consider the surrounding circumstances, including what the officers did immediately before? That's a great question. I think there's a distinction between the evidence that's admissible versus the evidence that can be used as a basis of finding liability. Deering came to this court after a jury trial, and the question was whether or not the jury should have been allowed to hear evidence of the warrant that was issued. It was a very minor warrant. And in that case, this court held that the jury, you know, Judge Ripple's dissent in that case, that the jury should have heard about the warrant. Well, but even the majority opinion said it was pretty darn close to the warrant. It was a close call. In this case, if the case were to proceed to trial, certainly the fact that Deputy Blanchard kicked open the door would be admitted into evidence. They can hear it, but they can't consider it. It wouldn't form the basis of liability. The basis for Fourth Amendment liability rests with the seizure itself. So there's, I mean, the law is pretty clear that there's all sorts of pre-seizure conduct that can be considered, right? Because Graham says you can consider the nature of the offense the person committed. The distinction is the pre-seizure conduct of who? I don't think that's correct, Your Honor. Graham v. Connor identifies that we should be considering the totality of the circumstances and provides three examples. Severity of the crime at issue. That's pre-seizure conduct. Correct. But it's pre-seizure conduct on the part of the suspect. What was the suspect's crime? So you can consider one side's pre-seizure conduct, but not the other. I think that's exactly right, Your Honor. So totality means kind of the totality of one side's? Because what we're balancing in a use of force case is we're balancing the officer's use of force compared to what's the suspect doing, what's the crime that the suspect's accused of. Is the suspect taking actions that are putting the officer at risk of danger? And I think that's the distinction. Okay. Thank you, Your Honor. Thank you. Good morning, Your Honors. Michael Rasek. I'm here on behalf of the plaintiff's appellee, Nancy Brown. We recognize these are delicate cases, both this one and the one before us. As we know, the courts don't want the handicapped officers who are trying to stop criminal conduct. I think the first point here, of course, is that's not what was involved here. And that's what led to the basis for most of the arguments. The first question was simply that the district court had was whether or not qualified immunity would even matter when you have a situation where the officer precipitated the conduct. And according to this court's prior cases, in Starks, for example, and in other circuits as well, Allen on the 10th, Ludwig up in the 8th, the courts are to look to pre-seizure conduct to see if the officer in some way precipitated the event. Shouldn't pre-seizure conduct – I've really been thinking about this a lot. Shouldn't pre-seizure conduct be examined only under the due process standard of whether it shocks the conscience, given that the Fourth Amendment protects only against unreasonable searches and seizures, not all undesirable government conduct? That's a thought. I believe it's been expressed in a couple of the cases. But the courts have, at least to this date, have not gone down that route. They have not looked to conduct that shocks the conscience. It's usually conduct that's going to be used with the Fifth Amendment rather than the Fourth Amendment, I would suggest. What the courts have looked at here and what the parties have looked at in these cases is simply whether or not what the officers did triggered the event. And almost everyone – the Supreme Court said we should look at the totality of the cases does look at pre-seizure conduct. In this case, the officers relied upon pre-seizure conduct in part because the court will recall that they argued that one of the reasons they did what they did was because they had been told in advance that this gentleman was trying to commit suicide. That was one of the reasons for their actions. So Mr. Hall says that there's a distinction between pre-seizure conduct that forms the pre-seizure conduct. In other words, what the officers could have done or should have done or might have done. What about that? I'm not sure I quite appreciate the distinction, but I'd like to answer it this way. I think it was Alan that said we have to have the pre-seizure conduct be closely or immediately preceding the seizure itself. The courts have very – I think have been clear they do not want to go back in time. In this case, I think Judge Connell, you may actually have mentioned it, the time involved, the total conduct is two minutes. The decision to kick in the door and confront this gentleman with an armed weapon came right with the act. That's what we can surmise because of the time involved. So I would suggest to this court, rather than try to devise a broad rule, that this court falls within Stark's and Alan, because the conduct itself is so intimately related. The pre-seizure conduct is so intimately related to the event. If somebody had planned this event a day before, I don't know that I can make the same argument, but I don't want to go down that path if I don't have to. I'd rather limit it to the facts of this case. The other element here is in terms of when these officers were present. This isn't a situation like so many of the cases that – all the other cases that talk about whether you can use pre-seizure conduct, where there was a criminal event involved. It was rather a circumstance where there was no crime involved. There was no threat – as court is aware, there's no threat to anyone. No threat to the officers, no threat to Mrs. Brown, no threat to anyone outside. And without that threat, the need to confront the individual in a way that the cases and the guidelines from Wisconsin say is likely to make it worse doesn't exist. I can't tell the court exactly what should have been done, but this was not the thing to do. I'm sorry. How could the deputies tell whether he was engaging in superficial cutting or dangerous cutting of his wrists without physically examining him? In other words, based on his mother's statement to the dispatcher that he was attempting suicide and the presence of significant bleeding, wouldn't it be reasonable for the deputies to believe that urgent action was needed? I'm wondering if you, like the case before us, before yours, whether you're suggesting that there's no urgency until the person bleeds out almost to the point of unconsciousness. I don't have to go that far down that road, Your Honor. In this case, the mother also told the dispatcher, who said he had told everything to the officers, he's not committing suicide. When she talked to Such, when he came in, I believe he's not suicidal. He's cutting himself. The only evidence of blood here was one officer who said, after this event began, after he kicked in the door, he said, I saw blood on his left wrist. That's all. This is apparently not at all like the facts of the case that preceded mine. Obviously, at the time of his blood, we presume that the officers, and that brings to the next point, though. The district court judge said, and even if he is committing suicide, that's not one of the exceptions to deadly force. To stop me from killing myself by killing myself, it can't be. It simply can't be the way to do it. So if Judge Adelman was right that there was a disputed fact issue on what happened immediately as they entered the room, in other words, did he have the knife or not? If he was right about that, then they're not entitled to qualified immunity on that, what I guess I'll call theory, right? Correct. If that's the case, do we have to get to the pre-seizure conduct issue? You don't have to, but I would ask the court to do it because this case is then going to go back down to trial, and without, it's unusual for somebody who's an appellee to be looking for a decision. It's going to go back down to trial, and the trial court judge is going to look for some guidance. Yeah. And that's a problem. I mean, if the court believes there's something that needs to be clarified there, then this would be the opportunity to do it. What Your Honor said would just be the second part of what my argument is, and the court from its questions on the other conduct or the other argument is aware of what happened. There's a discrepancy between the sides as to what happened here. If the jury decides to believe Mrs. Brown, this was a precipitate event that basically involved kicking in a door with a gun drawn and shooting the person. We're not even clear that he advanced on anybody. It's a jury under these facts, and without, and believing Mrs. Brown's statement that nothing was told to him, he didn't disobey any order because he wasn't given an order, that the door was kicked in, all he did was stand up. I don't know what it means to have a knife raised, but the officer did not say he lunged towards me, which is the Elizondo, I think, is what the testimony was. The jury could decide nothing more happened than I kicked in the door, I stand up with my knife, and the officer... We don't have an awful lot of information as to what happened. All we have is the officer's affidavit, right? That's correct. And what Mrs. Brown heard, which... Mrs. Brown. But we know you folks, there was no deposition taken of the officers. No, sir. No, there was not. So the officers were at liberty to put as much as they wanted into their affidavit, and as I pointed out in my brief, the affidavits themselves mirror each the other. But you seem to be content on the case being decided on the affidavits, you really didn't try to probe anything further with respect to the position of the knife, or the degree of aggressiveness that might have been manifested. That's correct. Given the facts as they were, and given what Mrs. Blanchard heard, so that we had the potential scenario that I just gave to the court, standing up and being shot, that should carry the case to the jury. Were you the lawyer in the trial court? I was not, Your Honor. The second officer, standing behind the officer who discharged his weapon, he had a taser. Does the record show whether the officer who fired his weapon had a taser, had the choice of using a taser? It does not. My understanding from reading it is that Officer Blanchard drew his weapon, meaning his handgun, and the other officer was behind him with the taser. Normally, he would do that in the opposite way. I can anticipate the responses, well, we didn't have enough room here to have people side by side. Well, the other officer had just shown up, he'd been outside, right? Yeah, and he'd come back in. It's not clear how long he was there, but he was right behind him. The bottom line is, from all of that, if you're going to confront somebody, you don't do it in a tiny little space. Let me tell you what's bothering me right here and let you answer it. I don't have a sense that you folks didn't try very hard to really flesh out the facts as to what happened at that crucial moment. I'm really disturbed that you let the officers get away with their affidavits, that you didn't probe any further. Judge, you put me in an awkward spot, and if it was me, I am prone as a litigator to depose anybody as long as I can to get information, but there is another school of thought that says when you have enough proof to take your case to the jury, you'd be quiet and let the other side hang themselves at trial. Very good lawyers have told me that, and they've been very successful at doing it. If we had more answers here, I might be able to give the court more, but the burden isn't on me at this point. The burden was on the other side, and they don't have the information to give you the answers either. What they have is two affidavits, which I don't know if the story given to me in law school was apocryphal or real, but in a terrible tragedy fire, I believe, the lecturers said the star witness came forward and the defense lawyer said, tell us what happened, and she gave the whole long story, and I think your honor has seen me coming, and he said, can you just do that? And she did it, and she did it the same way every time, and I don't know in real life what happened, but he won the case. If all the jury hears is what's in those two affidavits, and that's pointed out to them, and that's what they're going to have hammered at them, then the trial lawyer's tactic will have worked. That is a general proposition, may be very correct, but here the fact of the matter is we're trying to figure out what this officer apprehended when he saw the scene, and he says he saw a guy facing him with a knife raised. And that's all he said. So if somebody kicks in my bedroom door, I have not threatened anybody, and I stand up with a knife in my hand, can I be shot? I would suggest that Judge Adelman got it right, said that's not enough, that is unreasonable use of lethal force, when it didn't have to be done. There were many things that could have been done here in terms of avoiding this incident, none were. Unless the court has some further questions, the court obviously has gone through this once before this morning, and we obviously simply ask that the district court's judgment be affirmed. Thank you. Thank you. Every case is different. Every case relies on different facts. Hi, Mr. Hall. Thank you, Your Honor. Counsel, it is strange that the officer discharged his revolver into this fellow when there was another officer standing directly behind him with a taser. To answer your question to prior counsel, Your Honor, it is not in the record, but Deputy Blanchard did not have a taser. But regardless of the fact, he was aware that Deputies Sutch had a taser, and they both, in their affidavits, consistently indicated that they didn't feel the taser would be effective. They were in too close of quarters, and I think we need to look no further than the case that preceded argument before us, where tasers are not guaranteed to be effective. And when you're in this tight of a quarters, five to six feet away, the danger with someone armed with a knife is very real, and it's very imminent. And so both officers had made the decision that they didn't feel a taser would be effective. The other point I would like to make in rebuttal, Your Honor, is that the door was kicked in twice. You know, and as the estate's attorney suggests that, well, you know, all he did was stand up and he held a knife and he was shot, that's not true. If that was the case, then Mr. Brown would have been shot after the door was kicked in the first time, and that's not what occurred. The door was kicked in the first time, Mr. Brown advanced, and the affidavits indicate that Mr. Brown advanced with the knife in his right hand, but that it was down at his hip, and he used the other arm to slam the door closed. Then from there, the officer kicked the door open again, this time things were different. He advanced and he moved the knife in an upward direction. Once that occurred, that's what changed the officer's reaction. It wasn't just a matter of standing up and holding a knife. If it was, Mr. Brown would have been shot when the door was kicked open the first time. It's a really small point, but I was curious about how did, if a door gets kicked in, typically it means something gets broken. How did it get closed? I couldn't figure that out. I'm not entirely sure, Your Honor, and I'm not entirely sure that the door was closed to the extent that it latched or anything. Maybe it was just pushed to or something. I think that's probably more likely, but the record isn't clear on that. Again, the key dispositive facts in this case are that Mr. Brown was armed with a knife, he was advancing towards the officers, he was only five to six feet away, and he raised the knife in the moments before he was shot. Those are the material facts. The differences about when Mr. Brown said, you're going to have to shoot me in the head is of no consequence to this case, and the lack of recollection of hearing Deputy Blanchard yell, drop the knife, again, doesn't change what the officers undisputedly confronted when they shot Mr. Brown. Based on these arguments in our briefs, we request that the Court reverse the District Court. Thank you, Mr. White. Thank you, Your Honor. Thank you, Mr. Resak. Thank you both. The case, like all other cases, will be taken under advisement.